UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL J. HOGAN,                        )        Case No. 4:08CV2539
                                         )
             Petitioner,                 )        JUDGE CHRISTOPHER A. BOYKO
                                         )
       v.                                )        Magistrate Judge George J. Limbert
                                         )
ROBERT WELCH, Warden,                    )
                                         )
             Respondent.                 )        **Report and Recommendation**
                                         )        **of Magistrate Judge**
                                         )
                                         )

     Petitioner Michael Hogan ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF Dkt. #1.  Petitioner seeks relief for alleged constitutional violations that occurred during his Mahoning County, Ohio Court of Common Pleas conviction for Murder and Aggravated Robbery.  ECF Dkt. #1.  On March 16, 2009, Respondent Robert Welch ("Respondent") filed an answer.  ECF Dkt. #7.  On August 3, 2009, Petitioner filed a traverse and a motion to stay proceedings.  ECF Dkt. #10. On May 28, 2009, Respondent filed a brief in opposition to Petitioner's motion to stay proceedings.  ECF Dkt. #11.  On June 9, 2009, Petitioner filed a reply brief.  ECF Dkt. #13.

     The case was referred to the undersigned for a Report and Recommendation.  For the following reasons, the undersigned RECOMMENDS that the Court DISMISS the petition in its entirety with prejudice:

I.     **SYNOPSIS OF THE FACTS**

     The Seventh District Court of Appeals of Ohio set forth the facts of this case on direct appeal.  These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. §2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denie*d, 119 S.Ct. 2403

(1999).  As set forth by the Seventh District Court of Appeals, the facts are:

{¶ 2} On May 31, 2002, John and Louise Ruble went to the recycling station at Fire Station Number 4 on South Avenue in Boardman. When they exited their car to unload their recyclables, Mrs. Ruble left her purse on the front seat. When Mrs. Ruble turned to get back into their car, she saw her husband hanging on to a moving blue car. The car was headed toward South Avenue at a high rate of speed while dragging Mr. Ruble. As the car neared South Avenue, Mr. Ruble fell onto the pavement. The car backed up, struck a mailbox, and ran over Mr. Ruble. The car then went forward and ran Mr. Ruble over a second time. It then drove away. Mr. Ruble died shortly after from his injuries. A witness identified appellant as the driver of the car that struck and killed Mr. Ruble.

{¶ 3} A Mahoning County grand jury subsequently indicted appellant on one count of murder, a first degree felony in violation of R.C. 2903.02(B), and one count of aggravated robbery, a first degree felony in violation of R.C. 2911.01(A)(3). Appellant proceeded to a jury trial and the jury found him guilty as charged. Subsequently, the trial court sentenced appellant to 15 years to life for murder and 10 years for aggravated robbery, to be served consecutively.

{¶ 4} Appellant subsequently filed a motion for a new trial, asserting various errors. Next, he filed a timely notice of appeal from his judgment entry of sentence. The trial court denied appellant's motion for a new trial. He then filed a timely notice of appeal from that judgment. This court consolidated the two appeals.

\*       \*       \*

{¶ 28} Mrs. Ruble testified first. She stated that she and her husband had gone to the recycle station behind the Boardman fire station on South Avenue during the afternoon of May 31, 2002. They exited the car and unloaded the recyclables. (Tr. 350). Mrs. Ruble left her purse in the car on the front seat. (Tr. 350, 353). The trunk was open and Mrs. Ruble did not have a clear view around it. (Tr. 355). After she put the last items into the recycle bin, Mrs. Ruble turned around to see her husband hanging onto a blue car as it drove at a high rate of speed down the driveway towards South Avenue. (Tr. 356-57). She stated that the car backed up and her husband fell onto the pavement. (Tr. 358). The driver of the car then backed it up, running over her husband. (Tr. 358). The driver then drove forward, running over Mr. Ruble again and this time dragging him. (Tr. 359-60). Mr. Ruble died as a result. (Tr. 368-69).

{¶ 29} Mrs. Ruble also identified a purse that was found in Mill Creek Park as her purse that was taken that day. (Tr. 351-52). She testified that after leaving the recycle station, she cancelled her Discover Card. (Tr. 368).

{¶ 30} Mill Creek Park Officer Wilbert Drayton located Mrs. Ruble's purse. He testified that someone who was walking in the park found Mrs. Ruble's purse and turned it in to him. (Tr. 890). Detective Sergeant Stephen Riwniak testified that cash was stolen from Mrs. Ruble's purse. (Tr. 1121).

{¶ 31} Patricia Sikora works at a lottery booth in the Matthews Plaza near the fire station. She was working on the day in question. Sikora remembered that a white man in a blue car with peeling paint drove through her booth to buy cigarettes. (Tr. 388-89). When she was shown a photograph of appellant's car, Sikora testified that although she was not absolutely certain that it was the same car she saw that day, it was consistent with the one she saw. (Tr. 391).

{¶ 32} Joseph Pink was driving east on 224 around one o'clock in the afternoon on May 31. He testified that he was behind a faded, dark blue Cadillac with the windows down playing loud, vulgar rap music. (Tr. 404). When he approached the intersection at South Avenue, the Cadillac pulled into the left-hand turning lane to go onto South Avenue and he pulled up next to it. (Tr. 404). He sat next to the Cadillac for a good minute, as the light had just changed. (Tr. 404-405). Pink tried to get the Cadillac driver's attention to make a comment to him about his music, but the driver did not look over at him. (Tr. 405-406). Pink described the driver as a clean, white male wearing a light tee shirt. (Tr. 406). He also stated the driver had light brown hair slicked back and had a pointed nose. (Tr. 406). Pink later picked appellant out of a photo lineup as the driver of the Cadillac. (Tr. 443). He also identified appellant in court as the driver of the Cadillac he saw that day. (Tr. 443).

{¶ 33} Detective Riwniak also testified about Pink's identification of appellant. He stated that when he showed Pink a photo lineup, Pink picked out appellant with a front view and again with a profile view. (Tr. 1005).

{¶ 34} Appellant's counsel questioned Pink about the statement he gave to police. In his statement, Pink stated that the driver of the Cadillac had a ponytail. (Tr. 451). Pink admitted that appellant did not have a ponytail in the photo lineup. (Tr. 452).

{¶ 35} Bernie Belfrange was driving on South Avenue in the early afternoon of May 31. When he was in front of Pat Catan's, Belfrange noticed a blue car backing out of the recycle station at a fast rate of speed. (Tr. 456). He stated that he saw a man being dragged by the car. (Tr. 456). When the car got in front of the fire station, it whipped around and ran over the man's legs. (Tr. 457). Belfrange then saw the car back into a mailbox, run over the man again, and drag the man under the car. (Tr. 457). The car finally drove past Belfrange at a high rate of speed. (Tr. 457). Belfrange stated that the car was a late 80's Cadillac. (Tr. 457). He also stated that he got a good profile view of the driver. (Tr. 457).

{¶ 36} Belfrange stated that the police brought him a photo lineup to see if he could identify the driver of the Cadillac. (Tr. 461). However, the photo lineup only contained front views, not profiles. (Tr. 461). Belfrange could not make a definite identification from the front view photos and asked for profile photos. (Tr. 462). The police showed him profile photos a few days later. (Tr. 463). Belfrange picked out appellant's photo as the man he saw driving the Cadillac. (Tr. 463; State's Exh. 154). Belfrange then identified appellant in court as the man he saw run over Mr. Ruble. (Tr. 463-64).

{¶ 37} Detective Riwniak was present when Belfrange examined the photo lineup. He stated that Belfrange originally picked appellant out of the front view photos, but stated that he needed a side profile to be sure. (Tr. 1001). Detective Riwniak testified that a few days later, he showed Belfrange a photo lineup with side profiles and Belfrange immediately identified appellant. (Tr. 1001).

{¶ 38} On cross-examination, Belfrange acknowledged that in his statement to police, he described the man he saw as being no more than 22 years old, with very short, dark hair. (Tr. 467). He also noted that the man was wearing a white tee shirt and had a pointy nose. (Tr. 467). Belfrange additionally stated that the Cadillac was a two-door vehicle. (Tr. 477).

{¶ 39} Boardman Police Officer Mark Jacobs testified that he was the first officer dispatched to the scene at approximately 1:30 p.m. (Tr. 482). At that time, the ambulance had arrived and paramedics were tending to Mr. Ruble. (Tr. 483). While at the scene, Officer Jacobs measured the width of the tire acceleration marks. (Tr.

-3-

528). He found that from outside edge to outside edge measured 63 inches. (Tr. 529).

{¶ 40} Officer Jacobs also testified that he was called to 135 East Myrtle in Youngstown the day after Mr. Ruble died. (Tr. 503). There he found a Cadillac matching the description of the car that ran over Mr. Ruble. He and other officers put a tarp around the car and had it towed. (Tr. 506). Officer Jacobs opined that the marks on the bumper of the Cadillac were consistent with the mailbox post in front of the fire station where Mr. Ruble was struck. (Tr. 513-14). He also opined that the side of the Cadillac was consistent with having rubbed against the flag pole at the fire station. (Tr. 514).

{¶ 41} Becky Fiore is appellant's neighbor. She testified that in the early evening of May 31, she noticed a dark blue Cadillac pull into the Hogans' driveway. (Tr. 621). Appellant was driving the car. (Tr. 621). Appellant got out of the car, went into the garage, moved something out of the way, pulled the car into the garage, and closed the garage door. (Tr. 621). Fiore also testified that the Cadillac had previously always parked in the driveway. (Tr. 624). She had never seen it parked in the garage before that day. (Tr. 624).

{¶ 42} Brian Sloan is a DNA analyst at Orchid Cellmark who analyzed DNA evidence in this case. Hairs were found stuck to appellant's Cadillac. Sloan analyzed one of those hairs and compared it to Mr. Ruble's blood sample. Although he was unable to test the hair's nuclear DNA, Sloan was able to analyze the hair's mitochondrial DNA. Mitochondrial DNA is passed down through maternal lineage. (Tr. 640). It is used to analyze DNA when traditional nuclear DNA sequencing has failed. (Tr. 639). Based on his analysis, Sloan was able to determine, within a reasonable degree of scientific certainty, that the hair found attached to appellant's car came from someone of the same maternal lineage as Mr. Ruble. (Tr. 670).

{¶ 43} Officer John Gares arrested appellant during the evening of May 31, on an unrelated charge, at Teenie's Tavern in Youngstown. When he arrived at the scene, appellant was standing outside of his dark blue Cadillac. (Tr. 809). Appellant's girlfriend was with him. (Tr. 809-810). When Officer Gares placed appellant in custody, appellant asked if he could release his car to his girlfriend. (Tr. 810). Officer Gares agreed. (Tr. 810). Appellant then leaned out of the window of the police cruiser and instructed his girlfriend to take his car to his father's house. (Tr. 811). He was very direct and repeated to her several times to take care of the car and not to let anyone else have the car. (Tr. 811-12).

{¶ 44} Donna Rose works in the trace evidence unit at the Bureau of Criminal Identification and Investigation (BCI). She examined the jean shorts Mr. Ruble was wearing when he was run over. Rose testified that the jean shorts were missing a belt loop. (Tr. 863). She also examined a belt loop that was found attached to the underside of appellant's Cadillac. She stated that she compared the color of the material on the jeans and belt loop and examined them microscopically. (Tr. 864). She looked at the threads to inspect the type of fabric, the consistency of the color, and the diameter of the threads. (Tr. 865). She opined that the threads from Mr. Ruble's jean shorts and the belt loop found under appellant's car were similar with respect to color, microscopic characteristics, and chemical composition. (Tr. 867).

{¶ 45} Detective Riwniak also testified about the belt loop. He stated that there was a piece of fabric under the car close to the catalytic converter. (Tr. 1020). The piece of fabric was later determined to be the belt loop. (Tr. 1020).

{¶ 46} Detective Riwniak additionally testified regarding his inspection of the car. He

-4-

testified that when he visually inspected appellant's car, he noticed that there was a dent to the gas tank and that the undercarriage looked like something had brushed up against it on the driver's side. (Tr. 986). He also stated that he could see fibers or hairs near the driver's side rear wheel well and on the corner of the rear bumper. (Tr. 986-87). Additionally, he saw a cloth fabric on the front bumper. (Tr. 986).

{¶ 47} Furthermore, upon inspecting the inside of the car, Detective Riwniak found cleaning supplies in the back seat. (Tr. 1021). He further observed that the car looked like it had recently been washed. (Tr. 1021).

{¶ 48} On cross-examination, appellant's counsel questioned Detective Riwniak about another suspect police had in this case. Boardman police had received information regarding a man named Joe Direnzo, who was involved with several purse snatchings, one occurring on May 30, 2002. (Tr. 1087). Direnzo was also a suspect in this case. (Tr. 1092). Additionally, one Hector Pagan described Direnzo as having shoulder-length blonde hair, a thin beard, and wearing a white tee shirt on May 31, 2002. (Tr. 1107). Counsel mentioned that while appellant's hair was not long enough for a pony tail, Direnzo's hair was. (Tr. 1108). This was relevant because Pink had described the man he saw on 224 turning onto South Avenue as having a pony tail. (Tr. 451, 1108). Furthermore, Detective Riwniak attempted to corroborate Direnzo's statement that he was at a doctor's appointment on the day on question, only to find out Direnzo did not have an appointment that day. (Tr. 1110-11). Additionally, Detective Riwniak testified that Direnzo gave police a statement implicating appellant. (Tr. 1080-83). Finally, Detective Riwniak noted that one Sarah Cassidy gave a statement that she saw the driver of the car come out of the Pat Catan's parking lot at a high rate of speed and that he was a black man. (Tr. 1115-16). This was relevant because Pagan told police Direnzo was with a black man that day. (Tr. 1116).

{¶ 49} Ed Lulla works for BCI investigating crimes in Northeast Ohio. He inspected appellant's Cadillac. Lulla testified that he noticed several hairs hanging from the car. (Tr. 1132-35, 1147). He also found the belt loop hanging from the undercarriage. (Tr. 1142).

{¶ 50} Additionally, appellant called numerous witnesses in his defense.

{¶ 51} Steven Grim testified that on the afternoon in question, he took appellant's mother to an appointment and then to Teenie's Tavern. (Tr. 1223). At 12:16 p.m., he received a call on his cell phone from appellant, who was at home at the time. (Tr. 1223-24, 1227). At 12:45 p.m., Grim dropped appellant's mother off at home and saw appellant in the garage cleaning his car. (Tr. 1228-29).

{¶ 52} Hector Pagan testified that police questioned him about Direnzo's whereabouts. (Tr. 1236). Direnzo had stayed at Pagan's house previously. (Tr. 1236). Pagan testified that on the day in question, Direnzo came to his house and asked him to cash a stolen check for him. (Tr. 1241). Direnzo was with his girlfriend and a black man in a blue-gray, four-door Cadillac. (Tr. 1241). Pagan testified that he told Direnzo and his girlfriend that police had questioned him about them regarding a homicide and that they were scared. (Tr. 1246).

{¶ 53} On cross-examination Pagan testified that appellant and Direnzo knew each other. (Tr. 1247). He also testified that Direnzo's brother informed him that Direnzo had robbed someone at a cemetery. (Tr. 1248-49).

{¶ 54} Officer Anthony Ciccotelli testified regarding damage to appellant's car in December 2001. He stated that he had appellant's Cadillac towed on December 30,

-5-

2001. (Tr. 1261). At that time, the car had a dent in the right, rear bumper and the left, front bumper had a dent and small scratches on it. (Tr. 1262).

{¶ 55} Neal Zoldan, a private investigator, examined appellant's car in September and October 2002. Zoldan testified that he measured the tires on appellant's car from outside wall to outside wall and found that from tread mark to tread mark measured 66 inches. (Tr. 1281). This conflicted with Officer Jacobs' measurement of the tire marks at the scene, which he measured to be 63 inches. (Tr. 530). However, Dale Chambers testified that a car's wheel base can change based on variables such as weight shifting and air loss. (Tr. 795-98).

{¶ 56} William Hummel towed appellant's Cadillac on April 29, 2002 because it had a flat tire. He testified that at that time, the Cadillac had a dent in the left door. (Tr. 1289). However, he also testified that at that time the Cadillac did not have any damage to the undercarriage. (Tr. 1297).

{¶ 57} Sarah Cassidy was traveling on South Avenue on the day in question. She noticed a car fly out of the Pat Catan's parking lot between 1:02 and 1:30 p.m. (Tr. 1302, 1311). She testified that it was a square car, black or dark blue, and probably a late 80's model. (Tr. 1302, 1310). Cassidy stated that a black man was driving the car. (Tr. 1303).

{¶ 58} Patricia Billet was also traveling on South Avenue that day. As she approached the fire station, she heard somebody cry out, saw a car back into the mailbox, and then the car ran over a man lying on the ground in the fire station's driveway. (Tr. 1315-16). She described the car as a charcoal gray, either an Oldsmobile, Buick, or Cadillac, four-door, late 80's or early 90's model. (Tr. 1316, 1319-20). Billet testified that she recognized the car as an Oldsmobile or Buick because the taillights were flush to the car. (Tr. 1318). When she was shown photographs of appellant's car, Billet testified that the body looked like the car she saw that day but that the taillights were different. (Tr. 1321-22).

{¶ 59} Sandra Campana, like the others, was traveling on South Avenue that day. She saw a car at the fire station run over an elderly man. (Tr. 1336-37). She noticed that the car was dark blue and that it had a dent by the front tire. (Tr. 1337). When counsel showed Campana photographs of appellant's car, she stated that it was not the car she saw that day because it did not have the dent that she noticed. (Tr. 1342).

{¶ 60} Jeff D'Altorio was also driving on South Avenue that day. He observed a Cadillac leave the fire station and pull directly in front of him. (Tr. 1357). D'Altorio described the Cadillac as being four-door and faded blue. (Tr. 1358). He described the driver as an 18 to 30 year-old with short, tight hair that was spiked up. (Tr. 1360). D'Altorio testified that police showed him a photo lineup, but he could not pick out the man he saw. (Tr. 1361). When counsel showed him a photograph of appellant's car, D'Altorio stated that he did not think that was the Cadillac he saw because he remembered it being a lighter blue. (Tr. 1363).

ECF Dkt. #7, Ex. 9; *State v. Hogan*, Case No. 03-MA-224, 04-MA-3, 2005 WL 2268055 at ¶¶ 2-4

(Ohio App. 7th Dist., Sept. 13, 2005), unreported.

## II.     PROCEDURAL HISTORY

### A.     State Trial Court Proceedings

On June 27, 2001, the Mahoning County, Ohio prosecuting attorney filed an indictment charging Petitioner with Murder, in violation of Ohio Revised Code § 2903.02(B)(D), and Aggravated Robbery, in violation of O.R.C. § 2911.01(A)(3)(C).  ECF Dkt. #7, Ex. 1.  On October 24, 2003, a jury found Petitioner guilty of both counts.  ECF Dkt. #7, Ex. 2.  On October 29, 2003, the trial judge sentenced Petitioner to a prison term of 15 years to life for the Murder conviction and 10 years for Aggravated Robbery, with the sentences to be served consecutively.  *Id*.

On November 7, 2003, Petitioner filed a Motion For Judgment of Acquittal / For New Trial. ECF Dkt. #7, Ex. 3.  Petitioner raised the following grounds in his motion:

I.      Irregularity in the proceedings or in any ruling or order of the Court, abuse of discretion by the Court, because of which the Defendant was prevented from having a fair trial.

II.     Misconduct of the Prosecuting Attorney.

III.    That the verdict is not sustained by sufficient evidences [sic] or is contrary to law.

IV.     Errors of law occurring at the trial.

V.      The verdict of the jury was against the manifest weight of the evidence.

ECF Dkt. #7, Ex. 3.  On December 17, 2003, the trial judge denied Petitioner's motion.  ECF Dkt. #7, Ex. 4.

### B.     Direct Appeal

On August 16, 2004, Petitioner filed a brief in support of his direct appeal, raising the following assignments of error:

1.     THE TRIAL COURT DENIED MICHAEL HOGAN DUE PROCESS OF LAW AND THE RIGHT TO A JURY TRIAL, IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, BY SENTENCING MR. HOGAN TO PRISON BASED ON FACTS NOT FOUND BY THE JURY OR ADMITTED BY MR. HOGAN. (October 29, 2003 Judgment Entry; Sentencing Tr. Pp. 9-14).

2.     IN VIOLATION OF DUE PROCESS, THE GUILTY VERDICTS ON AGGRAVATED ROBBERY AND MURDER WERE ENTERED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

3. THE TRIAL COURT ABUSED ITS DISCRETION IN NOT GRANTING MICHAEL HOGAN'S MOTION FOR NEW TRIAL BASED ON MANIFEST WEIGHT OF THE EVIDENCE. (December 17, 2003 Judgment Entry).

ECF Dkt. #7, Ex. 6.  On November 26, 2004, the state filed a brief in opposition.  ECF Dkt. #7, Ex. 7.  On December 20, 2004, Petitioner filed a reply brief.  ECF Dkt. #7, Ex. 8.  On September 13, 2005, the Seventh District Court of Appeals affirmed the trial court's judgment.  ECF Dkt. #7, Ex. 9.

On October 27, 2005, Petitioner filed a memorandum in support of jurisdiction in the Supreme Court of Ohio.  ECF Dkt. #10.  Petitioner raised the following proposition of law:

A trial court violates the Sixth and Fourteenth Amendments to the United States Constitution when it sentences a criminal defendants to sentence greater than the "statutory maximum," as defined by the U.S. Supreme Court in *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L. Ec. 2d 403.

ECF Dkt. #7, Ex. 10.

On May 19, 2006, the Supreme Court of Ohio reversed the judgment of the Ohio Court of Appeals and remanded Petitioner's case for resentencing pursuant to  *State v. Foster*, 845 N.E.2d 470 (Ohio 2006).  ECF Dkt. #7, Ex. 11.

**C.** **Resentencing**

On August 25, 2006 the trial court resentenced Petitioner and imposed the same sentence that it had imposed previously.  ECF Dkt. #7, Ex. 12.

On December 4, 2006, Petitioner filed a notice of appeal to the Seventh District Court of Appeals.  ECF Dkt. #7, Ex. 13.  Petitioner filed a brief on the merits raising the following assignments of error:

I. The trial court erred by imposing non-minimum, maximum, and consecutive sentences in violation of the Due Process and Ex Post Facto Clauses of the United States Constitution.  Fifth Sixth, and Fourteenth Amendments to the United States Constitution; *Blakely v. Washington* (2004), 542 U.S. 296; *United States v. Booker* (2005), 543 U.S. 220. (August 25, 2006 Judgment Entry; August 24, 2006 Resentencing Hearing T. pp. 14-16).

II. Trial counsel provided ineffective assistance, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution, for failing to object to the trial court's imposition of non-minimum, maximum, and consecutive sentences. (August 25, 2006 Judgment Entry; August 24, 2006 Resentencing Hearing T. pp. 14-16).

-8-

III.   The trial court committed plain error and denied Mr. Hogan due process of law by imposing non-minimum, maximum, and consecutive sentences. Fifth and Fourteenth Amendments to the United States Constitution; Section 16, Article I of the Ohio Constitution. (August 25, 2006 Judgment Entry; August 24, 2006 Resentencing Hearing T. pp. 14-16).

IV.   The trial court did not have the authority to impose consecutive sentences. (August 25, 2006 Judgment Entry; August 24, 2006 Resentencing Hearing T. pp. 14-16).

ECF Dkt. #7, Ex. 13.  The state filed a brief in opposition.  ECF Dkt. #7, Ex. 14.  Petitioner filed

a reply.  ECF Dkt. #7, Ex. 15.  On June 15, 2007, the Seventh District Ohio Court of Appeals

affirmed the sentence imposed by the trial court.  ECF Dkt. #7, Ex. 16.

On July 13, 2007, Petitioner filed a notice of appeal to the Supreme Court of Ohio.  ECF

Dkt. #7, Ex. 17.  Petitioner filed a memorandum in support of jurisdiction raising the following

propositions of law:

I.   The remedy that this Court set forth in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856 violates the Ex Post Facto Due Process Clauses of the United States Constitution.

II.   Trial counsel provides ineffective assistance, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution, for failing to object to a trial court's retroactive application of the remedy that this Court set forth in *Foster*.

III.   A trial court commits plain error and denies a defendant due process of law by retroactively applying this Court's remedy as set forth in *Foster*. Fifth and Fourteenth Amendments to the United States Constitution; Section 16, Article I of the Ohio Constitution.

IV.   Trial courts do not have the authority to impose consecutive sentences.

ECF Dkt. #7, Ex. 17.  The state filed a waiver of memorandum in response.  ECF Dkt. #7, Ex. 18.

On October 24, 2007, the Supreme Court of Ohio denied leave to appeal.  ECF Dkt. #7, Ex. 19.

**D.   28 U.S.C. § 2254 Petition**

On October 24, 2008, Petitioner filed the instant petition for a writ of habeas corpus.  ECF

Dkt. #1.  Petitioner raised the following grounds for relief:

**GROUND ONE:**   The state court judgments and convictions against Petitioner are void because his convictions and sentences were secured in violation of liberties guaranteed by the U.S. Const. Amend. VI and XIV when Petitioner was denied the effective assistance of appellate counsel for counsel failing to raise the additional issue on direct appeal that Petitioner's conviction for

aggravated robbery was based upon insufficient evidence.

**GROUND TWO:**     The state court judgments and convictions against Petitioner are void because his convictions and sentences were secured in violation of liberties guaranteed by U.S. Const., Amend. VI and XIV when Petitioner was denied the effective assistance of appellate counsel because appellate counsel failed to allege that Petitioner had been denied timely access to Brady material.

**GROUND THREE:**   The state court judgments and convictions against Petitioner are void because his convictions and sentences were secured in violation of liberties guaranteed by U.S. Const., Amend. VI and XIV when Petitioner was denied the effective assistance of appellate counsel because counsel failed to raise the additional issue on direct appeal that Petitioner's convictions for murder and aggravated robbery were obtained in violation of Petitioner's constitutional right to a speedy trial.

**GROUND FOUR:**    The state court judgments and convictions against Petitioner are void because his convictions and sentences were secured in violation of liberties guaranteed by U.S. Const., Amend. VI and XIV when Petitioner was denied the effective assistance of appellate counsel because his appellate counsel failed to challenge the clear denial of due process when the State withheld Brady material and when it was disclosed that there were irregularities in eyewitness identification.

**GROUND FIVE**:    Petitioner was denied due process of law in violation of U.S. Const., Amend. XIV when his state court trial was infected by repeated state misconduct, a denial of U.S. Const., Amend. XIV.

**GROUND SIX**:     Petitioner was sentenced in violation of the Due Process and Ex Post Facto Clauses of the United States Constitution when the state court trial judge imposed non-minimum, maximum, and consecutive sentences.

ECF Dkt. #1.  On March 16, 2009, Respondent filed an answer.  ECF Dkt. #7.  On August 3, 2009, Petitioner filed a traverse and a motion to stay proceedings.  ECF Dkt. #10.  On May 28, 2009, Respondent filed a brief in opposition to Petitioner's motion to stay proceedings.  ECF Dkt. #11. On June 9, 2009, Petitioner filed a reply brief.  ECF Dkt. #13.

## III.    PROCEDURAL BARRIERS TO REVIEW

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus.  As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."  532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).

-10-

Further, the Supreme Court has held that it would be in the interests of the parties and the courts for the merits of a petition to be addressed forthwith if it is clear that the applicant does not even raise a colorable federal claim. *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *Prather v. Rees*, 822 F.2d 1418, 1421-22 (6th Cir. 1987) (lack of exhaustion was properly excused where petition was plainly meritless, the state had not addressed exhaustion, and disposition of the case would not offend federal-state comity).

Respondent concedes that the instant petition is timely, but he contends that Grounds 1-5 are barred for failure to exhaust state court remedies. *See* ECF Dkt. #7 at 13-21.

### A.    Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final.  28 U.S.C. § 2244(d)(1).  The AEDPA statute of limitations is not an issue in this case.  *See* ECF Dkt. ## 1, 14, 18.  Respondent contends, however, that Petitioner's claims are barred as a result of procedural default.  ECF Dkt. #14.

### B.    Exhaustion of State Remedies

As a general rule, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004).  The exhaustion requirement is satisfied "once the federal claim has been fairly presented to the state courts." *Franklin v. Rose*, 811 F.2d 322, 325 (6th Cir. 1987).  To exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998); *see also McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  General allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present" claims that specific constitutional rights were violated. *McMeans*, 228 F.3d at 681 citing *Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984).

In order to have fairly presented the substance of each of his federal constitutional claims to the state courts, the petitioner must have given the highest court in the state in which he was convicted a full and fair opportunity to rule on his claims. *Manning v. Alexander*, 912 F.2d 878,

-11-

881 (6th Cir. 1990). A petitioner fairly presents the substance of his federal constitutional claim to the state courts by: (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004), quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003); *see also Levine v. Torvik*, 986 F.2d 1506, 1516 (6th Cir.) cert. denied, 509 U.S. 907 (1993)(quotation omitted).

In *Harris v. Lafler*, this Sixth Circuit laid out the options that a district court may pursue in dealing with a petition that contains unexhausted claims:

> When faced with this predicament in the past, we have vacated the order granting the writ and remanded the case to the district court so that it could do one of four things: (1) dismiss the mixed petition in its entirety, *Rhines*, 544 U.S. at 274, 125 S.Ct. 1528; (2) stay the petition and hold it in abeyance while the petitioner returns to state court to raise his unexhausted claims, *id*. at 275, 125 S.Ct. 1528; (3) permit the petitioner to dismiss the unexhausted claims and proceed with the exhausted claims, id. at 278, 125 S.Ct. 1528; or (4) ignore the exhaustion requirement altogether and deny the petition on the merits if none of the petitioner's claims has any merit, 28 U.S.C. § 2254(b)(2).

553 F.3d 1028, 1031-32 (6th Cir. 2009). The Supreme Court has held that "the petitioner has the burden . . . of showing that other available remedies have been exhausted or that circumstances of peculiar urgency exist." *Darr v. Burford*, 339 U.S. 200, 218-19 (1950), *overruled in part on other grounds*, *Fay v. Noia*, 372 U.S. 391 (1963). A petitioner will not be allowed to present claims never before presented in the state courts unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal, or that he is actually innocent of the crime for which he was convicted. *Coleman v. Thompson*, 501 U.S. 722, 748 (1991).    **C.    Procedural Default**

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman,* 501 U.S. at 730. For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained

-12-

state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition. *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary. *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted. *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under the *Maupin* test, a reviewing court must decide:

(1)     whether the petitioner failed to comply with an applicable state procedural rule;

(2)     whether the state courts actually enforced the state procedural sanction;

(3)     whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and

(4)     if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.  Simply stated, a federal court may review federal claims:

that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004).  The above standards apply to the Court's review of Petitioner's claims.

**IV.     STANDARD OF REVIEW**

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and procedural default, AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 well after the act's effective date of April 26, 1996. *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).  Under Section 2254, a state prisoner is entitled to relief if he is held in custody in

-13-

violation of the United States Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus.  The AEDPA provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.*  Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A. Decisions of lower federal courts may not be considered.

-14-

B.  Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C.  The state court decision may be overturned only if:

1.  It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

2.  the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

3.  'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

4.  the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D.  Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable.  That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'  'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.  Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).  The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

-15-

(e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e).  The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact.  *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509 U.S. 907 (1993).  The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility."  *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997).  Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law.  *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000).  Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

## V.     ANALYSIS

### A.     Exhaustion

Respondent first contends that the instant petition should be dismissed for failure to exhaust state court remedies because Petitioner did not file an Ohio Rule of Appellate Procedure 26(B) application to reopen his appeal due to ineffective assistance of appellate counsel.  ECF Dkt. #7 at 15-21.  Respondent goes on to contend that the failure to present these claims constitutes res judicata, which would bar the instant claims.  *Id*. at 16.  Respondent postulates that Petitioner is arguing ineffective assistance of appellate counsel to establish cause and prejudice to excuse his failure to pursue a Rule 26(B) application.  *Id*.  Respondent contends that Petitioner's Rule 26(B) application would now be a "long-expired" action. Respondent concludes however, that the issue in this case is not one of procedural default, but one of exhaustion.  *Id*. at 17.

Petitioner has moved to stay proceedings while he pursues a Rule 26(B) application in the state courts. ECF Dkt. #10.  Respondent opposes this motion, reasoning that, although Petitioner was represented by the State Public Defender's Office on his appeal in the Ohio Court of Appeals and in the Supreme Court of Ohio, he was represented by a different attorney from that office and could

have asserted ineffective assistance of appellate counsel.  ECF Dkt. # 11 at 2-3.

The undersigned recommends that the Court reject Respondent's argument pertaining to exhaustion of remedies.  Respondent continues to assert that Petitioner has no remaining remedy in the state courts: "Hogan presents no demonstrable reasons in his petition to qualify as good cause for his failure to exhaust these remedies through a Rule 26(B) action, **he has lost his chance to raise these arguments again in state court**" (ECF Dkt. #7 at 20) " . . . Petitioner's time period in which he could have filed a timely Rule 26(B) action has passed (the rule requires filing within ninety days of the appellate court's judgment). . ." (ECF Dkt. #11 at 5).  Respondent fails to acknowledge that dismissal for failure to exhaust state court remedies presumes that a state court remedy remains available.  As the Middle District of Tennessee observed:

> Exhaustion is based on the assumption that the state remedies available to a prisoner are adequate and effective to vindicate federal constitutional rights. When state remedies become ineffective or inadequate, the rationale behind exhaustion is undercut and federal courts may take whatever action is required by the situation.

*Fuller v. Tennessee*, No. 3:09-0394, 2009 WL 2850695 at *4 (M.D.Tenn., Aug. 29, 2009) citing *Shelton v. Heard*, 696 F.2d 1127, 1128 (5th Cir.1983).  Similarly, another Judge of this Court has stated that:

> As to the constitutional challenge, which was never fairly presented to the Ohio appellate courts, respondent contends that the remedy of delayed appeal pursuant to O.R.C. § 2953.05 is presently available. The State argues, citing *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), that a prisoner must fairly present each constitutional objection to the validity of his confinement to the state courts in order to satisfy the exhaustion requirement of section 2254. *Picard* assumed, however, that state remedies were then available to the federal habeas petitioner and that he failed to utilize them. **The issue presented in the instant case is whether a delayed appeal is available to an Ohio prisoner who has previously been unsuccessful on his direct appeals.**
>
>             *       *       *
>
> There being no deliberate by-pass and no presently available state forum for consideration of petitioner's claims, the Court may proceed to the merits of the case. *Fay v. Noia*, *supra*.

*Riley v. Havener*, 391 F.Supp. 1177, 1178 (N.D. Ohio 1974) (emphasis added).

-17-

Further, on Respondent's own admission, the unexhausted claims are time-barred. Therefore, presenting them to the state courts would be futile. And "a habeas court should excuse exhaustion where further action in state court would be an exercise in futility." *Turner v. Bagley*, 401 F.3d 718, 724 (6th Cir. 2005). Therefore, the undersigned recommends that the Court deny Respondent's request to dismiss the instant case based upon failure to exhaust state court remedies.

Typically, the undersigned would consider the issue of procedural default where a petitioner has failed to present a claim in state courts and that claim has allegedly become procedurally barred. However, since Respondent clearly states that he is not asserting a procedural default defense and has not advanced any procedural default analysis, the undersigned will proceed to the merits of the instant petition.

The undersigned recommends that the Court deny Petitioner's motion to stay proceedings because, upon review of the merits of the instant petition, the undersigned believes that the claims in the instant Petition lack merit and it would be in the interests of the parties and the courts for the merits of a petition to be addressed forthwith if it is clear that the applicant does not even raise a colorable federal claim. *Granberry*, 481 U.S. at 135; *Prather*, 822 F.2d at 1421-22.

**B.      Ground One: Whether appellate counsel was ineffective for not arguing insufficiency of the evidence**

In Ground One Petitioner claims that appellate counsel was ineffective for failing to argue that his conviction was not supported by sufficient evidence. ECF Dkt. #1 at 10-13. Petitioner contends that Ohio Revised Cose § 2911.01 defines Aggravated Robbery as follows:

> (A) No person, *in attempting or committing a theft offense, as defined in section 2913.01* of the Revised Code, or in fleeing immediately after *the attempt or offense*, shall do any of the following:
>
>> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
>>
>> (2) Have a dangerous ordnance on or about the offender's person or under the offender's control;

-18-

(3) Inflict, or attempt to inflict, serious physical harm on another.

ECF Dkt. #1 at 12 quoting O.R.C. § 2911.01 (emphasis in Petition).  Petitioner contends that "There was  no testimony at trial that indicated that Petitioner had taken or had attempted to take Mrs. Ruble's purse.  The purse was recovered, but Petitioner's fingerprints were not found on it."  ECF Dkt. #1 at 12.

A defendant is entitled to the effective assistance of counsel in his first appeal of right.  *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Mapes v. Tate*, 388 F.3d 187, 191 (6th Cir. 2004).  A claim of ineffective assistance of appellate counsel is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which is the same standard governing the review of a claim for the ineffective assistance of trial counsel.  Hence, in order to prevail on his claims, Petitioner must show that appellate counsel deficiently performed and "the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable."  *Mapes*, 388 F.3d at 191, citing Strickland, 466 U.S. at 687.  In order to establish deficient performance, a petitioner must show that counsel's performance fell below an objective standard of reasonable representation.  *Id*. at 688.  In *Mapes v. Coyle*, 171 F.3d 408, 427- 28 (6th Cir.), cert. denied, 528 U.S. 946, 120 S.Ct. 369, 145 L.Ed.2d 284 (1999), the Sixth Circuit Court of Appeals listed eleven questions as matters to be considered in determining whether an attorney on direct appeal acted in accordance with the objective standard of reasonableness in reviewing the deficient performance prong of the ineffective assistance of appellate counsel.  In order to establish prejudice, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id*. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the case.  *Id*.; *Williams v. Taylor*, 529 U.S. 362, 390-391 (2000).

Moreover, it must be remembered that appellate counsel is not ineffective if he or she fails to raise every nonfrivolous claim on direct appeal.  *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). The process of " 'winnowing out weaker arguments on appeal' " is "the hallmark of effective appellate advocacy."

-19-

*Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting Barnes, 463 U.S. at 751-52, 103 S.Ct. 3308). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir.1986).

Petitioner's claim of ineffective assistance of appellate counsel is dependent upon the merits of his other claims – here insufficiency of the evidence. An allegation that the verdict was entered upon insufficient evidence states a claim under the due process clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307, *reh'g denied*, 444 U.S. 890 (1979), *and In re Winship*, 397 U.S. 358 (1970). On habeas review, the District Court cannot weigh the credibility of the witnesses. *Walker v. Engle*, 703 F.2d 959, 969. Nor is the District Court permitted to overturn a conviction merely because it would have acquitted had it acted as the finder of fact. *Brown v. Davi*s, 752 F.2d 1142, 1147 (6th Cir. 1985), *and Walker,* 703 F.2d at 969. In order to establish an insufficiency of the evidence claim, the relevant inquiry is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Scott v. Mitchell,* 209 F.3d 854, 885 (6th Cir. 2000), *quoting Jackson,* 443 U.S. at 319. "This requires successful challengers to meet a very high threshold, even with respect to newly-discovered evidence." *Apanovitch v. Houk*, 466 F.3d 460, 488 (6th Cir. 2006). The inquiry is not whether the jury made the *correct* determination of guilt or innocence, but whether it made a *rational* decision to acquit or convict. *Williams v. Haviland,* No. 1:05CV1014, 2006 WL 456470, *3 (N.D.Ohio Feb. 24, 2006), citing *Herrera v. Collins,* 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). A court should interfere with a jury verdict only to the extent necessary to guarantee the fundamental protections of due process of law. *Scott,* 209 F.3d at 885 *quoting Jackson,* 443 U.S. at 319.

Here, Petitioner's claim lacks merit because circumstantial evidence was presented to establish that he had taken or attempted to take Mrs. Ruble's purse, and circumstantial evidence may be sufficient to support a conviction. *Clifford v. Chandler*, 333 F.3d 724, 728 (6th Cir. 2003) , *overruled in part on other grounds by Wiggins v.Smith*, 539 U.S. 510 (2003); *Apanovitch*, 466 F.3d

-20-

at 488; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).  Mrs. Ruble testified that she left the purse on the front seat of her car, and she next observed a vehicle driving away dragging her husband.  Her purse was later recovered. Therefore, a reasonable inference could be drawn that the occupant of the vehicle had stolen the purse.

Petitioner does not challenge the *sufficiency* of the evidence pertaining to his identity as the perpetrator.  Rather, he contends that Mrs. Ruble's purse did not have his fingerprints and at least one of the State's witnesses identified the driver of the Cadillac as having a ponytail, while Petitioner did not have a ponytail.  These assertions challenge the *weight* of the evidence introduced against him.  In other words, these arguments seek to overcome eyewitness testimony implicating him in the crime.  But, they ignore the fact that some evidence was introduced to establish Petitioner's guilt.  In other words, circumstantial evidence was introduced to establish that Mrs. Ruble's purse was stolen, Petitioner's Cadillac was involved in the robbery, and Petitioner himself was involved in the robbery.    As stated above, experts testified that evidence was recovered from Petitioner's vehicle connecting it to the scene of the crime where the purse was stolen.  Below is the appellate court's synopsis of some of the testimony constituting circumstantial evidence supporting a conclusion that Petitioner's vehicle was used in the theft of Ms. Rubble's purse:

{¶ 41} Becky Fiore is appellant's neighbor. She testified that in the early evening of May 31, she noticed a dark blue Cadillac pull into the Hogans' driveway. (Tr. 621). Appellant was driving the car. (Tr. 621). Appellant got out of the car, went into the garage, moved something out of the way, pulled the car into the garage, and closed the garage door. (Tr. 621). Fiore also testified that the Cadillac had previously always parked in the driveway. (Tr. 624). She had never seen it parked in the garage before that day. (Tr. 624).

{¶ 42} Brian Sloan is a DNA analyst at Orchid Cellmark who analyzed DNA evidence in this case. Hairs were found stuck to appellant's Cadillac. Sloan analyzed one of those hairs and compared it to Mr. Ruble's blood sample. Although he was unable to test the hair's nuclear DNA, Sloan was able to analyze the hair's mitochondrial DNA. Mitochondrial DNA is passed down through maternal lineage. (Tr. 640). It is used to analyze DNA when traditional nuclear DNA sequencing has failed. (Tr. 639). Based on his analysis, Sloan was able to determine, within a reasonable degree of scientific certainty, that the hair found attached to appellant's car came from someone of the same maternal lineage as Mr. Ruble. (Tr. 670).

{¶ 43} Officer John Gares arrested appellant during the evening of May 31, on an unrelated charge, at Teenie's Tavern in Youngstown. When he arrived at the scene,

appellant was standing outside of his dark blue Cadillac. (Tr. 809). Appellant's girlfriend was with him. (Tr. 809-810). When Officer Gares placed appellant in custody, appellant asked if he could release his car to his girlfriend. (Tr. 810). Officer Gares agreed. (Tr. 810). Appellant then leaned out of the window of the police cruiser and instructed his girlfriend to take his car to his father's house. (Tr. 811). He was very direct and repeated to her several times to take care of the car and not to let anyone else have the car. (Tr. 811-12).

{¶ 44} Donna Rose works in the trace evidence unit at the Bureau of Criminal Identification and Investigation (BCI). She examined the jean shorts Mr. Ruble was wearing when he was run over. Rose testified that the jean shorts were missing a belt loop. (Tr. 863). She also examined a belt loop that was found attached to the underside of appellant's Cadillac. She stated that she compared the color of the material on the jeans and belt loop and examined them microscopically. (Tr. 864). She looked at the threads to inspect the type of fabric, the consistency of the color, and the diameter of the threads. (Tr. 865). She opined that the threads from Mr. Ruble's jean shorts and the belt loop found under appellant's car were similar with respect to color, microscopic characteristics, and chemical composition. (Tr. 867).

{¶ 45} Detective Riwniak also testified about the belt loop. He stated that there was a piece of fabric under the car close to the catalytic converter. (Tr. 1020). The piece of fabric was later determined to be the belt loop. (Tr. 1020).

{¶ 46} Detective Riwniak additionally testified regarding his inspection of the car. He testified that when he visually inspected appellant's car, he noticed that there was a dent to the gas tank and that the undercarriage looked like something had brushed up against it on the driver's side. (Tr. 986). He also stated that he could see fibers or hairs near the driver's side rear wheel well and on the corner of the rear bumper. (Tr. 986-87). Additionally, he saw a cloth fabric on the front bumper. (Tr. 986).

{¶ 47} Furthermore, upon inspecting the inside of the car, Detective Riwniak found cleaning supplies in the back seat. (Tr. 1021). He further observed that the car looked like it had recently been washed. (Tr. 1021).

ECF Dkt. #7, Ex. 9.  This testimony would permit the jury to draw reasonable inferences that Petitioner's car was used in the robbery (*see* ¶¶ 42, 44-47) and that Petitioner was the perpetrator (*see* ¶¶ 41, 43).

Further, eyewitnesses identified Petitioner as the perpetrator.  While Petitioner challenges the propriety of the photo lineups, those challenges generally attack the weight, not the sufficiency of the evidence.  Petitioner contends that:  "At least one witness whom the State used to identify Petitioner as the perpetrator said that the driver of the Cadillac had a ponytail, not an unimportant point since that person saw the driver only from a profile."  ECF Dkt. #1 at 12.  This statement itself

-22-

illustrates that Petitioner is attacking the weight of the evidence because the statement acknowledges that the witness ultimately identified Petitioner – that is the evidence sufficient to support the conviction.  Inconsistencies in witness' statements are a matter for consideration of the weight of the evidence, *i.e.*, whether the testimony was credible, which is beyond this Court's province.  Even so, it appears that sufficient evidence was introduced from other sources to support the jury's conclusion that Petitioner committed the crimes charged.

Since Petitioner's claim of insufficiency of the evidence lacks merit, his claim of ineffective assistance of appellate counsel based on that claim also lacks merit because Petitioner cannot establish deficient performance or prejudice.  Therefore, Ground One should be dismissed with prejudice.

### C.   Ground Two: Whether appellate counsel was ineffective for not alleging that Petitioner had been denied timely access to *Brady* material

In Ground Two Petitioner claims that appellate counsel failed to allege that Petitioner had been denied timely access to *Brady* materials.  ECF Dkt. #1 at 14.  Petitioner contends that, on October 20, 2003, trial counsel was consulting with potential defense witnesses and learned that the State of Ohio may have been in possession of information which would have assisted in establishing Petitioner's alternative theory of the case.  *Id.* at 14.  Petitioner contends that trial counsel brought the matter to the trial court's attention on October 21, 2003, as the defense case was beginning.  *Id.* Petitioner claims that, pursuant to order of the trial court, the prosecutor's office provided the court and counsel documents which were pertinent to Petitioner's defense, including 24 pages of reports. *Id.* Petitioner deemed 13 pages pertinent to his defense and suggested that there may have been another perpetrator.  *Id.* at 14-15.  Petitioner concludes that:

> In light of the impeachment of identifying witnesses, in light of the alibi and other witnesses presented by the defense, the previously undisclosed evidence very likely would have created the existence of reasonable doubt, sufficient to result in an acquittal, thereby undermining confidence in the outcome of the trial.

*Id.* at 15.  Petitioner contends that appellate counsel failed to raise this issue on direct appeal.  ECF Dkt. #1 at 16.

In determining if appellate counsel was ineffective, the Court must apply the same standard stated in Section V.B., above. Additionally, the Court must consider the pertinent law under *Brady*.

In *Brady*, the United States Supreme Court held that "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In later cases, the Court eliminated the requirement for a defendant to request favorable information and stated that the constitutional duty to disclose is "triggered by the potential impact of favorable but undisclosed evidence. . ." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995); *United States v. Bagley*, 473 U.S. 667 (1985); *United States v. Agurs*, 427 U.S. 97 (1976).

To prevail on a *Brady* claim in habeas, a petitioner must demonstrate that the State withheld evidence from the defense at trial that was both material and favorable. *Kyles,* 514 U.S. at 432; *Brady*, 373 U.S. at 87.

Evidence is considered to be "exculpatory" for *Brady* purposes if it is favorable to the accused. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). Exculpatory evidence includes impeachment material. *Bagley*, 473 U.S. at 676. In fact, inculpatory evidence may be considered *Brady* material if it may be used to impeach a witness. *Strickler v. Greene*, 527 U.S. 263, 21 (1999).

Evidence is "material" for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 433 (internal quotation omitted). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . ." *Id*. at 434. The *Kyles* Court reaffirmed an earlier holding from *Bagley* outlining four aspects of materiality. With regard to the first aspect, the *Kyles* Court stated that:

> The "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of

-24-

the trial."

*Kyles,* 514 U.S. at 435. The second aspect of materiality is that it is not a sufficiency of evidence test and a defendant need not demonstrate that after discounting inculpatory evidence in light of the undisclosed evidence, there would have been enough left to convict. *Id.* "One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

Third, the *Kyles* Court noted that there is no need for harmless error review once a court has found a constitutional error because a *Bagley* error could not be treated as harmless where there is a reasonable probability that the result of proceeding would have been different if the withheld evidence had been disclosed. *Kyles,* 514 U.S. at 435.

Fourth, the *Kyles* Court stressed that, in assessing materiality, suppressed evidence must be considered collectively, not item by item. *Kyles,* 514 U.S. at 436. The definition of *Bagley* materiality in terms of cumulative effect provides the prosecution with some deference while imposing a corresponding burden:

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady,* 373 U.S., at 87, 83 S.Ct., at 1196-1197), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles,* 514 U.S. at 437-38.

Further, a court is not to consider the motives of the prosecution in withholding the suppressed evidence. *Brady,* 373 U.S. at 87 ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution.*")

-25-

(emphasis added).

Here, Petitioner claims ineffective assistance of appellate counsel based upon a purported underlying *Brady* violation for untimely disclosure of exculpatory material.  Petitioner has failed to demonstrate what the exculpatory evidence was, how it was material, or how the outcome of the proceedings would have been different if it had been disclosed at an earlier juncture.  Rather, Petitioner rests on the premise that because the trial court compelled disclosure of the evidence and because defense counsel deemed 13 pages to be pertinent to the defense, the evidence constituted *Brady* material.

Respondent advances a speculative analysis based upon the claims Petitioner presented in is Motion for a New Trial.  ECF Dkt. #7 at 28-33.  The undersigned notes that Petitioner's Motion for a New Trial is distinct from the instant petition, and the undersigned's analysis is limited only to the arguments advanced in the petition presented to this Court and the accompanying traverse. Petitioner's arguments in his Motion for a New Trial would generally be considered probative only toward the issues of  whether he fairly presented the claim to the state courts (exhaustion analysis), whether he preserved the issue for appeal (procedural default), and perhaps whether appellate counsel was ineffective for failing to act in light of notice of the potential *Brady* claim.  However, Petitioner's arguments in his Motion for a New Trial are not automatically incorporated into his claims in the instant petition as Respondent interprets it.

This Court should not blindly accept the assertion in the instant petition that the evidence was *Brady* material, even if the state trial court ruled that it was.  Instead, Petitioner has the burden of demonstrating to *this Court* that the State's alleged failure to timely produce the material sought undermines confidence in the outcome of the trial.  Petitioner has not sufficiently identified the evidence to enable the Court to question the outcome of the trial.  Aside from failing to identify the evidence, Petitioner has not demonstrated to this Court that evidence was favorable, aside from asserting that he found it to be pertinent to his defense.  Even with the benefit of hindsight, he has not shown, for example, how he would have used the withheld evidence to conduct further discovery, to question witnesses at trial differently, or to further develop his theory of the case.  Since Petitioner

-26-

falls short of identifying the withheld evidence, let alone demonstrating that it was favorable and material, his related ineffective assistance of counsel claim should fail.

> **D.     Ground Three: Whether appellate counsel was ineffective for not alleging that Petitioner had been denied the constitutional right to a speedy trial**

In Ground Three Petitioner claims that appellate counsel failed to allege that he had been denied the constitutional right to a speedy trial.  ECF Dkt. #1, Ex. 18.  Again, Respondent contends that Petitioner has incorporated his Motion for a New Trial by reference.  ECF Dkt. #7 at 34.  The undersigned fails to see where Petitioner has incorporated this motion.  *See* ECF Dkt. #1 at 17-19. Regardless, Respondent contends:

> Although Hogan grounds his speedy trial violation as a Sixth Amendment violation, he never argued it as a constitutional violation in his Motion for New Trial.  To the extent that he is raising a constitutional claim now, it is not being fairly presented under federal habeas and would be procedurally defaulted.  Moreover, this state law claim is not cognizable in a federal habeas action.

ECF Dkt. #1 at 33.  Respondent's assertion is incorrect; procedural default and exhaustion are not an issue because Ground Three is not, in and of itself, a constitutional speedy trial claim.  Ground Three is an ineffective assistance of counsel claim based upon a constitutional speedy trial claim. An ineffective assistance of counsel claim can be based upon an underlying state-law error; therefore, even if Ground Three were based on a state law speedy trial violation, it would be cognizable in a federal habeas court.  The undersigned is not aware of any authority limiting ineffective assistance of counsel claims to matters of federal constitutional law.  Respondent has cited no authority for the proposition that an ineffective assistance of counsel claim must be based upon trial counsel's deficient performance related to a federal constitutional law issue.  Indeed, it is well-established that counsel's competence must extend to matters of state criminal law for the Sixth Amendment protection to have significance.  As the Supreme Court acknowledged that the Sixth Amendment requires competence in matters of state law:

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. **If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may**

**be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible.** He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. **He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.**

*Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963) (emphasis added).

While Petitioner's constitutional speedy trial claim would not be barred under the federal habeas mechanism of procedural default, the Court should consider whether the appellate claim would have been procedurally barred at the state level because appellate counsel cannot be deemed ineffective for "winnowing out" a procedurally barred claim.  *See Smith*, 477 U.S. at 536.

The undersigned has reviewed Petitioner's Motion for a New Trial (ECF Dkt. #7, Ex. 3). The undersigned disagrees with Respondent's interpretation of the motion as being based solely on state law.  The portion of the motion asserting a speedy trial claim is titled "Violation of the Defendant's Constitutional and Statutory Rights to Speedy Trial."  *Id*.  While the motion primarily argues Ohio statutes, it also states:

> In the instant case the Defendant filed two specific requests for discharge as a result of his 6th amendment right to a speedy trial. . . . At no time during these proceedings has the Defendant waived his . . . constitutional right[ ] to a speedy trial in open Court knowingly, intelligently and voluntarily.

ECF Dkt #7, Ex. 3 at 5.  Respondent contends that these arguments constitute general allegations of a denial of a constitutional right and did not fairly present the constitutional claims to the state courts. ECF Dkt. #7 at 35 citing *McMeans*, 228 F.3d at 681.  Respondent's assertion is misplaced because the issue here is not one of exhaustion as it was in *McMeans*.  Instead, the Court should consider the closely related question of whether Petitioner's purported failure to properly raise the *constitutional* speedy trial claim would bar the claim at the state appellate level under the doctrine of res judicata. *See State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967).  The inquiry into res judicata is probative because appellate counsel's performance cannot be deemed deficient if he consciously elected not to pursue a claim that had been waived by trial counsel and would be considered procedurally barred

-28-

on appeal.[1]  *See Smith*, 477 U.S. at 536.

> The *Perry* Court stated Ohio's res judicata rule as follows:
>
> Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment.

*Id*. Here, the state appellate court – not this Court – would make the determination of whether Petitioner's constitutional claim would be barred by Ohio's rule of res judicata on appeal. Since Petitioner did raise the issue of a constitutional violation in his motion for a new trial, it was arguably preserved for appeal. Therefore, the undersigned does not believe it would be prudent to speculate as to whether the appellate court would have barred the claim under res judicata. Consequently, the undersigned does not believe that counsel's performance can be deemed "non-deficient" for winnowing out a procedurally barred claim.

Even assuming the claim was not procedurally barred, Petitioner has failed to demonstrate to *this Court* that a constitutional speedy trial violation has occurred. Petitioner simply argues that trial counsel requested a continuance, without seeking a waiver, so that he could tend to an uncontested divorce. ECF Dkt. #1 at 18. A continuance of trial alone is insufficient to show that a speedy trial violation has occurred. Rather, one must demonstrate a violation through four factors: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id*. at 531. Here, Petitioner has failed to even articulate the length of time that elapsed between when he was charged and when he was brought to trial. ECF Dkt. #1 at 17-19; ECF Dkt. #10 at 15-17. Therefore, the Court is not obliged to consider the other factors under the *Barker* test. Even if it were, Defendant

---

[1]     Of note, Petitioner is *not* contending that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness for failing to preserve the issue of a constitutional speedy trial violation for appeal.

has made no showing to this Court, through the four *Barker* factors, that a speedy trial violation had occurred.  Since Petitioner has failed to demonstrate the merits of his underlying speedy trial claim, the undersigned recommends that the Court find that appellate counsel was not deficient and that Petitioner was not prejudiced.  The undersigned recommends that the Court dismiss Ground Three with prejudice accordingly.

> **E.**     **Ground Four: Whether appellate counsel failed to allege that Petitioner had been denied *Brady* material**

In Ground Four, Petitioner claims that appellate counsel failed to allege that Petitioner had been denied *Brady* material. ECF Dkt. #1 at 19-21.  Petitioner contends that appellate counsel failed to challenge the clear denial of due process when the police showed photographs to Joseph Pink and Bernard Belfrage that did not match the descriptions that they had given to police, and these witnesses identified Petitioner based upon these photographs. ECF Dkt. # a at 20.  Petitioner further contends that additional photographs were shown to the witnesses other than those produced at trial.

Petitioner's argument lacks merit because Petitioner has failed to demonstrate that appellate counsel knew of or should have known of the alleged *Brady* violation.  Counsel cannot be considered deficient for failing to raise a claim of which he was unaware or could not become aware with the exercise of due diligence.  *See Hemphill v. U.S.*, Case. Nos. 1:01-CR-39(2), 1:04-CV-351, 2006 WL 1064037 at *1 (S.D.Ohio, Apr. 21, 2006), unreported, ("The Court concludes, therefore, that Petitioner did not identify Robin Hicks to counsel as a potential witness. Being unaware of Hicks, counsel could not have been ineffective by failing to call her on Petitioner's behalf. Snyder's hearing testimony was consistent with and bolstered by his contemporaneous case file and case notes.").  Further, Petitioner has failed to demonstrate that a sufficient impropriety occurred during the out of court identifications to warrant suppression of the in-court identifications of Mr. Pink or Mr. Belfrage.

As Respondent notes, each witness' testimony basically comports with the factors to be considered for out of court identification in *Manson v. Brathwaite*, 432 U.S. 98, (1976) (the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of

-30-

attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.).  Petitioner does not refute this assertion.  *See* ECF Dkt. #10 at 17-18.  Since Petitioner has failed to demonstrate the merits of his underlying *Brady* claim, the undersigned recommends that the Court find that appellate counsel was not deficient and that Petitioner was not prejudiced.  The undersigned recommends that the Court dismiss Ground Four with prejudice accordingly.

### F.    Ground Five: Whether Petitioner's trial court convictions was infected by repeated state misconduct

In Ground Five, Petitioner claims that his trial court conviction was "infected by repeated state misconduct" in violation of the XIV Amendment.  ECF Dkt. #1 at 21-22.  Petitioner argues:

> 112.   In Petitioner's Ohio trial, the prosecution withheld *Brady* material and the police showed photographic arrays to Joseph Pink and Bernard Belfrage, and the individuals portrayed therein did not match the physical descriptions which those persons had provided to the police.

> 113.   Further, evidence presented at trial indicated that photographs other than those identified in court were displayed to the witnesses by the police prior to the witnesses' identification of Petitioner from the photographs.

ECF Dkt. #1 at 21-22.  The undersigned believes that Ground Five raises the same claims as those underlying Ground Four.  For the reasons stated in  in Section V.E., above, the undersigned believes that Petitioner has failed to establish the merit of this claim.  Accordingly, the undersigned recommends that the Court dismiss Ground Five with prejudice.

### G.    Ground Six: Whether the trial court's resentencing violated the Due Process and Ex Post Facto Clauses of the United States Constitution

In Ground Six, Petitioner contends that the trial court's resentencing pursuant to *State v. Foster* violated the Due Process and Ex Post Facto Clauses of the United States Constitution.  ECF Dkt. #1 at 22-24.  Petitioner contends that a consecutive maximum sentence for aggravated robbery imposed in this case violates his constitutional rights.  He appears to concede that the trial court's sentence for his murder conviction is constitutional.  *See* ECF Dkt. #1 at 22 ("Before *Foster* was decided, Petitioner's sentence for murder did not require the trial court to make any factual

-31-

findings.").

Several courts in this district, including this Court, have rejected Petitioner's argument, and held that courts could impose more than minimum sentences in resentencing following *Foster*. *See*, *e.g.*, *Orwick v. Jackson*, Case No. 3:09CV232, 2009 WL 4043352 (N.D. Ohio Nov. 20, 2009), unreported; *Ross v. Kelley*, No. 5:08CV2889, 2009 WL 3208668 (N.D. Ohio Oct. 5, 2009), unreported; *Kravochuck v. Shewalter*, No. 1:09CV199, 2009 WL 3208663 (N.D. Ohio Oct. 5, 2009), unreported; *McGhee v. Konteh*, No. 1:07CV1408, 2008 WL 320763 (N.D.Ohio Jan. 25 2008), unreported. *Woody v. Welch*, No. 3:08CV2534, 2009 WL 1440828 (N.D. Ohio, May 20, 2009), unreported.

### i.      Pertinent Law

Prior to Petitioner's initial sentencing, the U.S. Supreme Court decided *Apprendi* and held that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. While Petitioner's case was pending on direct appeal to Ohio's Seventh District Court of Appeals, the U.S. Supreme Court decided *Blakely* and held that the statutory maximum for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant, and not the maximum sentence a judge may impose after finding additional facts. *Blakely*, 542 U.S. at 303.

At the time Petitioner was convicted, the Ohio Revised Code allowed for a sentence of three to ten years for felonies of the first degree (Count 2 in this case). O.R.C. § 2929.14(A)(1). However, the Revised Code further provided that:

> (B) Except as provided in division (C), (D)(1), (D)(2), (D)(3), or (G) of this section, in section 2907.02 of the Revised Code, or in Chapter 2925. of the Revised Code, if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section, unless one or more of the following applies:
>
> > (1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.

> (2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others.

O.R.C. § 2929.14(B) (West 2004).  On February 27, 2006, the Supreme Court of Ohio consolidated four criminal cases in an opinion styled *State v. Foster* and held, *inter alia*, that R.C. § 2929.14(B) was unconstitutional because it "require[d] judicial fact-finding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant." *Foster*, 845 N.E.2d at 495.  The Supreme Court of Ohio went on to remedy the error by severing the unconstitutional mandatory judicial factfinding provisions:

> [R]eferences to mandatory judicial fact-finding properly may be eliminated in the four areas of concern. Without the mandatory judicial fact-finding, there is nothing to suggest a "presumptive term." To explain Ohio's "statutory maximum" for purposes of Apprendi and its progeny, the maximum prison term authorized by the jury verdict or the facts admitted by a defendant upon acceptance of a plea is the top of the sentencing range for the crime of which the defendant is convicted. For example, if the offender is convicted of a first-degree felony, the "statutory maximum" is ten years under R.C. 2929.14(A)(1).

*Id*. at 497.

### ii.　Application of law to Petitioner's case

Petitioner contends violations of both the Ex Post Facto Clause and the Due Process Clause of the federal constitution resulting from the retroactive application of post-*Foster* sentencing statutes to his case on remand.  *See* ECF Dkt. #1 at 22-24.  To the extent Petitioner's claim implicates the Ex Post Facto Clause, it lacks merit because the Supreme Court of Ohio is not a legislature bound by the Ex Post Facto Clause.  The Ex Post Facto Clause is contained in Article I of the federal constitution, which pertains to legislative powers.  And the United States Supreme Court made clear in *Rogers v. Tennessee*, 532 U.S. 451, 456 (2001), "As the text of the [Ex Post Facto] Clause makes clear, it is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government. . . We have observed, however, that limitations on ex post facto judicial decisionmaking are inherent in the notion of due process."  This Court has held that a petitioner cannot state a claim under the Ex Post Facto *Clause* for the Ohio Supreme Court's retroactive application of a judicially modified statute because the Ohio court is not a legislature.

*See Orwick,* 2009 WL 4043352 at *4; *see also Ross,* No. 5:08CV2889, (N.D. Ohio Oct. 5, 2009) (ECF Dkt. #10, Limbert, M.J. R&R at 42-44 "that if a law is improperly made retroactive by a court, a Petitioner's remedy, if he has one, lies in the Due Process Clause, not the Ex Post Facto Clause. . . *Rogers* makes clear that the pertinent question for determining whether a petitioner has a valid Ex Post Facto Clause claim is which branch of government committed the alleged constitutional violation. Here, Petitioner alleges that the judicial branch violated his constitutional rights; therefore his claim under the Ex Post Facto Clause lacks merit. . .The fact that the *Foster* court may have acted akin to the legislature does not make the Supreme Court of Ohio a legislature.  It remains true that 'As the text of the [Ex Post Facto] Clause makes clear, it is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government.' " *Rogers,* 532 U.S. at 456.") (ECF Dkt. #12 Nugent, J., Adopting  R&R.); *Kravochuck,* 2009 WL 3208663; *McGhee v. Konteh,* 2008 WL 320763.  The Honorable Solomon Oliver, Jr. has held the same:[2] "the trial court's use of the sentencing statute re-shaped by *Foster* in sentencing Woody did not violate due process or the Ex Post Facto Clause of the Constitution." *Woody,* 2009 WL 1440828 at *10 (N.D. Ohio, May 20, 2009), unreported.

Since Petitioner's Ex Post Facto Clause claim lacks merit, the undersigned recommends that the Court dismiss Ground Six of the instant petition to the extent that it asserts a violation of the Ex Post Facto Clause.

To the extent Petitioner claims that the Ohio courts violated his Due Process rights by retroactively applying the post-*Foster* sentencing statute to his case to impose non-minimum and maximum sentences for the Aggravated Robbery charge, the undersigned recommends that the Court find that his claim lacks merit.  Both Judge Nugent and Judge Oliver of this Court have rejected similar claims in other cases, holding that no constitutional violation arose with the retroactive application of  the post-*Foster* sentencing statute on remand to a petitioner who was improperly sentenced under the pre-*Foster* statute.  *See Ross,* No. 5:08CV2889; *Kravochuck,* No. 1:09CV199; *McGhee,* No. 1:07CV1408, 2008 WL 320763; *Woody,* 2009 WL 1440828 at *10 ("A number of

---

[2]      Of note, Petitioner's counsel was counsel of record in *Woody.*

federal defendants have alleged that the federal sentencing statutes reshaped by *Booker* violate due process because they subject defendants to ex post facto laws. Those challenges have been universally rejected. . . Woody makes no argument that distinguishes in any relevant respect Ohio's revised sentencing statutes from the revised federal sentencing statutes upheld by the appellate courts.")  (internal citations omitted). This Court adopted that position in *Orwick*.

Of note, the instant case involves imposition of a maximum sentence for a first degree felony.  Before it was severed in *Foster*, Ohio Revised Code § 2929.14(C) provided that:

> (C) Except as provided in division (D)(7), (D)(8), (G), or (L) of this section, in section 2919.25 of the Revised Code, or in Chapter 2925. of the Revised Code, **the court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders under division (D)(3) of this section, and upon certain repeat violent offenders in accordance with division (D)(2) of this section**.

O.R.C. § 2929.14(C) (emphasis added). In *Orwick* and *Ross* § 2929.14(C) was not at issue because less-than maximum sentences were imposed on resentencing.  In *Kravochuck*, a maximum sentence was imposed based upon the fact of a prior conviction, which is explicitly permitted under *Apprendi*. Regardless of any distinctions that exist from *Orwick*, *Ross*, and *Kravochuck*, Judge Nugent's reasoning from *Ross* applies here:

> The [United States Supreme Court] clearly stated [in *Cunningham v. California*, 549 U.S. 270, 127 S.Ct. 856, 166 L.Ed.2d 856 (2007),]  that on remand in that particular case, the state court could permit the judge to exercise discretion within a broad range.

*Ross*, 2009 WL 3208668 at *29.  As Judge Nugent explained in *Ross*, the United States Supreme Court did not foreclose California from resentencing the defendant to the upper range of the determinate sentencing law ("DSL"), even where the DSL obliged the trial judge to sentence the defendant to the 12-year middle term unless the judge found one or more additional "circumstances in aggravation."  *Id*.  at *27. Rather, California was permitted to sentence the defendant within a broad statutory range:

Prior to *Cunningham*, a California trial judge under the DSL had to make factual findings pertaining to mitigation or aggravation. The *Cunningham* Court held that the DSL violated a defendant's Sixth Amendment rights because it imposed a mandatory presumptive sentence and mandatory judicial factfinding. *See Cunningham*, 549 U.S. at 290-91. On remand from the United States Supreme Court, it is clear that California could resentence Mr. Cunningham to at least the middle DSL term, if not the maximum DSL term, because the *Cunningham* Court explicitly stated that the statutory maximum for *Apprendi* purposes was the middle DSL term. If Petitioner's argument in the instant case were to be valid and a court could not retroactively modify its sentencing statute to change judicial factfinding requirements in the way the *Foster* court did, then the *Cunningham* Court would have directed California to sentence Mr. Cunningham to the lowest DSL term. Otherwise, the *Cunningham* Court would have been endorsing a presumptive sentence (the middle DSL) that was improperly imposed. The Court, however, left California with much more discretion than that by allowing California to permit the judge to exercise discretion within a broad range. On remand, the *Cunningham* Court clearly allowed California to remove a presumption in order to impose a sentence that had been unconstitutional due to that presumption. In short, under the *Cunningham* Court's remand order, the California trial court could impose a sentence on remand that was initially unconstitutional.

*Ross*, 2009 WL 3208668 at *29.

To expand on the rationale in *Ross*, the undersigned noted that, in the *Cunningham* case, it appears that the only sentence that would not have offended Due Process was the minimum DSL because it did not require judicial factfinding or presumption. However, the *Cunningham* Court permitted California to impose sentences other than the minimum DSL on remand, implicitly approving retroactive abrogation of judicial factfinding and presumptions on resentencing. Otherwise, the *Cunningham* Court would have explicitly ordered resentencing to the minimum DSL.

Turning to the case at bar, the stated statutory range remained unchanged (3-10 years for first degree felonies), so that Petitioner had notice of the penalty he could receive for the crime he committed. The undersigned believes that the issue is whether Petitioner was ultimately sentenced under a statute that provided the judge sentencing discretion, and did not impose presumptions or mandate factfinding. In this case, the post-*Foster* sentencing statutes afforded the trial judge sentencing discretion within a statutory range, which included the statutory maximum of 10 years. Therefore, the trial court did not violate Petitioner's due process rights when it resentenced him within that range. Accordingly, the undersigned recommends that the Court find that Ground Six lacks merit insofar as it is based upon a the trial court's imposition of a maximum sentence for Aggravated Robbery.

-36-

Lastly, Petitioner claims that the Ohio courts violated his Due Process rights by imposing consecutive sentences based upon judicial fact finding.  Recently, the United States Supreme Court decided *Oregon v. Ice*, 129 S.Ct. 711 ( 2009), and held that "In light of this history, legislative reforms regarding the imposition of multiple sentences do not implicate the core concerns that prompted our decision in *Apprendi*." *Ice*, 129 at 717.  Applying this precedent, this Court has held that imposing consecutive sentences for discrete crimes does not violate the Due Process Clause of the federal constitution.  *Orwick*, 2009 WL 4043352 at *7; *see also Ross*, No. 5:08CV2889 (ECF Dkt. #10, R&R at 39-42, *adopted*, ECF Dkt. #12); *Kravochuck*, No. 1:09CV199 (ECF Dkt. #9, R&R at 17-19, *adopted*, ECF Dkt. #11).  Accordingly, the undersigned recommends that the Court dismiss Ground Six insofar as it claims Petitioner's constitutional rights were violated by the imposition of consecutive sentences.

## VI.    CONCLUSION

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.


DATE: December 2, 2009                          *s/ George J. Limbert*
                                                 GEORGE J. LIMBERT
                                                 UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).